**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LAURA G.,[1] | ) Case No. CV 17-8606-JPR |
| Plaintiff, | ) |
| | ) **MEMORANDUM DECISION AND ORDER** |
| v. | ) **REVERSING COMMISSIONER** |
| | ) |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**I. PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision terminating her disability insurance benefits ("DIB"). The parties consented to the jurisdiction of the undersigned under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed August 2, 2018, which the Court has taken under submission without oral argument. For the reasons

---

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1

stated below, the Commissioner's decision is reversed and this action is remanded for further proceedings.

## II. BACKGROUND

Plaintiff was born in 1959. (Administrative Record ("AR") 38, 65.) She completed "[s]ome college" (AR 39) and worked as a realtor for about 26 years (AR 198, 211).

On April 18, 2011, Plaintiff was found disabled as of July 16, 2010, because of breast cancer. (AR 67-74; see also AR 16, 17-18.) On March 21, 2014, she was notified that her disability was determined to have ended as of March 1, 2014, and that her benefits would be terminated. (AR 79, 102-05; see also AR 16.) After the decision was upheld on reconsideration (AR 80, 81), a disability hearing officer found her not disabled based on "the evidence in the file." (AR 111-17.) She then requested a hearing before an Administrative Law Judge. (AR 121, 279-86.) A hearing was held on May 5, 2016, at which Plaintiff, who was represented by counsel, and a vocational expert testified. (AR 33-64.)

In a written decision issued June 21, 2016, the ALJ found Plaintiff not disabled as of March 1, 2014.[2] (See AR 13-25.) Plaintiff requested review from the Appeals Council (AR 180-81, 313-17), which denied it on July 28, 2017 (AR 4-6). This action followed.

---

[2] The ALJ stated in two places that "the claimant's disability ended as of May 31, 2014" (AR 16; see also AR 18), but elsewhere in the decision she used the March 1, 2014 date (see, e.g., AR 14, 18, 19). The May 31, 2014 date is when Plaintiff's disability payments ended. (AR 79, 103.)

2

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV. THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

### A. The Eight-Step Evaluation Process

The ALJ follows an eight-step sequential evaluation process to assess whether a recipient continues to be disabled. 20 C.F.R. § 404.1594(f); see also Nathan v. Colvin, 551 F. App'x 404, 407 (9th Cir. 2014); Held v. Colvin, 82 F. Supp. 3d 1033, 1037 (N.D. Cal. 2015). In the first step, the Commissioner must determine whether the recipient is currently engaged in substantial gainful activity; if so, she is no longer disabled. § 404.1594(f)(1); see also McCalmon v. Astrue, 319 F. App'x 658, 659 (9th Cir. 2009).

If the recipient is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether she has an impairment or combination of impairments that meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, she continues to be disabled. § 404.1594(f)(2).

If the recipient's impairment or combination of impairments does not meet or equal an impairment in the Listing, the third step requires the Commissioner to determine whether medical improvement has occurred.[3] § 404.1594(f)(3). If so, the analysis proceeds to step four; if not, it proceeds to step five. Id.

---

[3] Medical improvement is "any decrease in the medical severity of [a recipient's] impairment(s) which was present at the time of the most recent favorable medical decision that [the recipient was] disabled or continued to be disabled." § 404.1594(b)(1). "A determination that there has been a decrease in medical severity" must be based on "improvement[] in the symptoms, signs, and/or laboratory findings associated with [a recipient's] impairment(s)." Id.

4

If medical improvement has occurred, the fourth step requires the Commissioner to determine whether the improvement is related to her ability to work — that is, whether there has been an increase in the recipient's residual functional capacity ("RFC")[4] from the most recent favorable medical decision. § 404.1594(f)(4). If medical improvement is not related to the recipient's ability to work, the analysis proceeds to step five; if it is, it proceeds to step six. Id.

If medical improvement has not occurred or if it is not related to the recipient's ability to work, the fifth step requires the Commissioner to determine whether an exception applies. § 404.1594(f)(5). Under the first group of exceptions, the Commissioner can find a recipient no longer disabled even though she has not medically improved if she is able to engage in substantial gainful activity; if one of those exceptions applies, the analysis proceeds to step six. § 404.1594(d). Under the second group of exceptions, the Commissioner can find a recipient no longer disabled without determining medical improvement or an ability to engage in substantial gainful activity; if one of those exceptions applies, the recipient is no longer disabled. § 404.1594(e). If none of the exceptions apply, the recipient continues to be disabled. § 404.1594(f)(5).

The sixth step requires the Commissioner to determine whether all the recipient's current impairments in combination are "severe," which means that they significantly limit her

---

[4] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 404.1545; see also Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

5

ability to do basic work activities; if not, she is no longer disabled. § 404.1594(f)(6).

If the recipient's current impairments in combination are severe, the seventh step requires the Commissioner to determine whether she has sufficient RFC, "based on all [her] current impairments," to perform her past relevant work; if so, she is no longer disabled. § 404.1594(f)(7).

If the recipient is unable to do her past work, the eighth and final step requires the Commissioner to determine, using the RFC assessed in step seven, whether she can perform any other substantial gainful work; if so, she is no longer disabled. § 404.1594(f)(8). If not, she continues to be disabled. Id.

B.  The ALJ's Application of the Eight-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from April 18, 2011, the date of her most recent favorable medical decision,[5] through March 1, 2014, the alleged cessation date. (AR 17-18.) In the 2011 CPD, Plaintiff had the impairment of breast cancer. (AR 18.) As of March 1, 2014, the ALJ found her to have medically determinable impairments of "history of breast cancer in remission and mild small airway disease/reactive airway disease." (Id.) At step two, the ALJ concluded that these impairments did not meet or equal a listing. (Id.) At step three, the ALJ found that medical improvement had occurred, and her "treatment records

---

[5] The most recent favorable medical decision is also known as the comparison-point decision ("CPD"). See Program Operations Manual System (POMS) DI 28010.105, U.S. Soc. Sec. Admin. (Jan. 13, 2016), http://policy.ssa.gov/poms.nsf/lnx/0428010105; see also § 404.1594(b)(7).

6

since March 1, 2014 reveal grossly conservative and infrequent medical treatment." (Id.) At step four, she determined that Plaintiff's medical improvement was related to her ability to work "because it resulted in an increase in [her] residual functional capacity." (Id.)

At step six, the ALJ found that since March 1, 2014, Plaintiff continued to have "a severe impairment or combination of impairments." (AR 19.) She also noted that Plaintiff had "nonsevere" "medically determinable impairments of degenerative disc disease of the cervical and lumbar spine and age related osteoporosis." (Id.) At step seven, she found that based on all of Plaintiff's impairments, she had the RFC to perform "light work" with the following limitations:

> lift and/or carry twenty pounds occasionally, ten pounds frequently[;] . . . sit, stand, or walk for six hours out of an eight-hour workday with normal breaks[;] . . . occasionally climb ramps, stairs, ladders, ropes or scaffolds[;] . . . frequently balance, stoop, kneel or crouch [and] occasionally crawl[;] . . . avoid concentrated exposure to pulmonary irritants, including dust, fumes, odors and gases.

(Id.) The ALJ concluded that Plaintiff could perform her past work as a real-estate sales agent. (AR 24.) Accordingly, she found that Plaintiff's disability had ended as of March 1, 2014. (Id.)

**V. DISCUSSION**[6]

Plaintiff argues that the ALJ failed to (1) "fully and fairly" develop the record (J. Stip. at 4)[7] or (2) "provide clear and convincing reasons" for rejecting her subjective pain testimony (id. at 14; see also id. at 4). As discussed below, remand is warranted based on the ALJ's failure to fully develop the record. Accordingly, the Court does not reach the other issue.

    A.   <u>The ALJ Did Not Fully and Fairly Develop the Record</u>

Plaintiff argues that the ALJ failed to "fully and fairly" develop the record. (J. Stip. at 4; <u>see also generally</u> id. at 4-10, 13-14.) Specifically, she contends that the ALJ improperly "cited to the objective findings of the [lumbar] MRI" (id. at 9)

---

[6] In <u>Lucia v. SEC</u>, 138 S. Ct. 2044, 2055 (2018), the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" and thus subject to the Appointments Clause. To the extent <u>Lucia</u> applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during her administrative proceedings. (<u>See</u> AR 313-17; J. Stip. at 4-10, 13-17, 19-20); <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended) (plaintiff forfeits issues not raised before ALJ or Appeals Council); <u>see also generally</u> <u>Kabani & Co. v. SEC</u>, 733 F. App'x 918, 919 (9th Cir. 2018) (rejecting <u>Lucia</u> challenge because plaintiff did not raise it during administrative proceedings); <u>Davidson v. Comm'r of Soc. Sec.</u>, No. 2:16-cv-00102, 2018 WL 4680327 (M.D. Tenn. Sept. 28, 2018) (same).

[7] Plaintiff never raised this argument during her administrative proceedings. (<u>See generally</u> AR 33-64 (hearing transcript), 313-17 (brief on appeal arguing only that ALJ erred in assessing her statements' credibility).) Normally, the claim would be forfeited. <u>See</u> <u>Meanel</u>, 172 F.3d at 1115. But because Defendant has not challenged it on this ground (<u>see generally</u> J. Stip. at 10-13), the Court proceeds to consider it. <u>See</u> <u>Dexter v. Colvin</u>, 731 F.3d 977, 979 n.3 (9th Cir. 2013); <u>Saari v. Berryhill</u>, 745 F. App'x 775, 776 (9th Cir. 2018).

8

and should have ordered a consultative examination or contacted Plaintiff's treating doctors "for further explanation or clarification" "[i]n light of the evidence of cord impingement and flattening at both the lumbar and cervical spine and the severe osteoporosis" (id. at 8-9). As explained below, remand is warranted on this ground.

1. Applicable law

An ALJ has a "duty to fully and fairly develop the record" and "assure that [a] claimant's interests are considered." Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (citation omitted); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) ("In making a determination of disability, the ALJ must develop the record and interpret the medical evidence."). But it nonetheless remains the claimant's burden to produce evidence in support of her disability claim. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (as amended). Moreover, the "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2010) (as amended May 19, 2011) (citation omitted); accord Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001). An ALJ has broad discretion in determining whether to order a consultative examination and may do so when "ambiguity or insufficiency in the evidence . . . must be resolved." Reed v. Massanari, 270 F.3d 838, 842 (9th Cir. 2001) (citation omitted); see also § 404.1519a(b) ("We may purchase a consultative examination to try to resolve an inconsistency in the evidence,

or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim.").

2. Relevant background

   a. *State-agency reviewing-physician records*

On March 21, 2014, general practitioner "H. Jone" assessed Plaintiff's RFC as "light" (AR 485) and limited her to occasionally lifting or carrying 20 pounds; frequently lifting 10 pounds; standing, walking, and sitting six hours in an eight-hour workday; occasionally climbing and crawling; and frequently balancing, stooping, kneeling, and crouching (AR 477-78). Dr. Jone found no manipulative, visual, or communicative limitations, and her only environmental limitation was to "avoid concentrated exposure" to "fumes, odors, gases, dusts, [and poor] ventilation." (AR 479-80.) Dr. Jone did not review any medical-source statement or specify which medical evidence was reviewed, though the doctor wrote that "all the evidence in file" had been reviewed. (See AR 482, 485; see also generally AR 476-83.)

In the "additional comments" section, Dr. Jone remarked that Plaintiff's "physical examination and laboratory findings [were] all normal," and her treating physician "was very pleased that [she] was doing very well" and did "not know why [she] [was] alway[s] tired[,] which is not explainable by any objective medical evidence." (AR 483.) Dr. Jone also noted that she had not been "taking lots of pain med[ications] for alleged severe 'bone' pain" and that "chemotherapy usually does not cause 'bone pain.'" (Id.) Regarding Plaintiff's shortness of breath, the doctor did not see any medical reason for her symptoms, noting that tests showed "normal respiratory rate and oxygen level."

(Id.)

In June 2014, Dr. Stuart Laiken[8] completed an RFC assessment and similarly limited Plaintiff's RFC. (See AR 513-16.) But unlike Dr. Jone, he found that Plaintiff's ability to "[r]each[] in all directions" was limited, citing her surgical history. (AR 515.) He concluded that Plaintiff's symptoms were "attributable . . . to a medically determinable impairment" but that the "severity" or "duration of the symptom(s)" was "disproportionate to the expected severity or expected duration on the basis of the . . . medically determinable impairment(s)." (AR 517.) He did not review any medical-source statement (AR 518), but he reviewed records from treating doctors and Plaintiff's fatigue questionnaire (AR 520-21).

                              b.    *MRIs and bone-density tests*

A December 2014 MRI of Plaintiff's lumbar spine had mostly "normal" and "unremarkable" results. (AR 538.) The radiologist noted "mild to moderate disc space loss with endplate degenerative changes," "broad-based posterior disc osteophyte complex," and "mild bilateral neuroforaminal narrowing" at L5-S1. (Id.) He also noted "broad-based posterior disc protrusion" at L4-L5. (Id.) He found "no evidence for metastatic disease in the lumbar spine" but suggested possible correlation between his findings and complaints of neuropathy. (AR 539.) An MRI of the

---

[8] Dr. Laiken appears to specialize in both internal medicine and cardiology because his electronic signature includes specialty codes of 19 and 04. (See AR 521); Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 15, 2015), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004 (code 04 indicates cardiology practice; code 19 indicates internal-medicine practice).

cervical spine done at the same time also revealed "no evidence for metastatic disease," but it showed "multilevel degenerative change . . . with mild cord flattening at C4-C5, C5-C6, and C6-C7 secondary to disc protrusions." (AR 540-41.)

Plaintiff had a bone-density study on March 20, 2015. (AR 536-37.) The results were compared to a test done on December 14, 2010, which had apparently led to a diagnosis of osteopenia.[9] (AR 536.) Plaintiff's bone density had decreased by 0.7 percent in her lumbar spine, 4.3 percent in her left hip, and 8.3 percent in her right hip, and the doctor concluded that she now had osteoporosis. (Id.) She did not give Plaintiff any treatment instructions other than advising her to follow up in "[two] years, based on [National Osteoporosis Foundation] recommendation[s]." (AR 537.) In February 2016, Plaintiff had another bone-density test, which revealed slight improvement in her lumbar and right-hip-bone mineral density. (AR 569-70; see also AR 564-68.) The reviewing doctor noted that Plaintiff did not have "current pathological fracture" and "estimate[d] a 10-year probability of major osteoporotic fracture at 8.5% and of hip fracture at 1.7%." (AR 569.) He recommended follow-up testing in two years. (AR 570.)

                c.   *Plaintiff's statements related to bone pain*

In a Fatigue Questionnaire dated March 2014, Plaintiff wrote that "a typical day consist[ed] of staying in and resting, due to

---

[9] Osteopenia is bone weakness that can progress into osteoporosis. What Is Osteopenia?, WebMD, https://www.webmd.com/osteoporosis/guide/osteopenia-early-signs-of-bone-loss#1 (last updated Oct. 28, 2018).

12

small airway disease and bone pain." (AR 261.) "[S]imple chores . . . cause[d] fatigue and shortness of breath." (Id.) She "prepar[ed] in advance for appointments and church" and "g[o]t help for shopping." (Id.) She asserted that her difficulties were "due to all the side effects from the multiple surgeries, medications, cancer, small airway disease/COPD, neuropathy, constant sore throat, neck pain, [and] bone pain." (Id.) Once, she "broke a rib" while doing laundry. (Id.) She did not walk daily, but she did "try and do some stretching to help relieve the pain" and napped "at least once a day." (AR 262.)

A couple months after Plaintiff was notified of the cessation of her disability benefits, she asked for reconsideration, stating that starting in January 2014, she had had "dizzi[]ness, headache, recurring sore throat, sore neck, upper [and] lower back pain, numbness in right hand and right leg and foot." (AR 266.) She claimed that her "pain [had gotten] worse," specifying "back pain and neck pain and throat pain." (AR 271.) In her request for a hearing, dated September 8, 2014, Plaintiff wrote that starting in January 2014 she had had a "very bothersome" hernia, "difficulty standing and walking," and "worse" small-airway problems. (AR 279.) She also complained that she was having trouble breathing "more often," was feeling "very fatigued," and was sleeping "longer hours." (Id.) She suffered from "stiffness of neck, bone aches and difficulty sitting for long periods of time." (Id.)

At the May 5, 2016 hearing, Plaintiff testified that she had pain in her "neck," "ribs," "arm," "hip area," "groin area," "leg," and "feet." (AR 42.) She took "pain medication" and

13

rested for the pain. (AR 44-45.) Her chest and rib pain was a "daily problem" and was at least a "four or five" out of ten. (AR 45.)

Plaintiff testified that she took Norco,[10] gabapentin,[11] and baclofen[12] for pain and anastrazole[13] as a hormone inhibitor. (Id.) She had Prolia injections[14] twice a year "for the bone loss." (AR 51.) She could "sit for about an hour or two," stand "probably half an hour," and walk "just short distances." (Id.) She could "comfortably" lift "about eight pounds, ten pounds." (AR 52.)

### 3. Analysis

Plaintiff argues that the ALJ failed to "fully and fairly develop the record" (J. Stip. at 8) because the state-agency reviewing physicians, whose opinions she gave "great weight" (AR 23), did not review the MRIs or bone-density scans that showed

---

[10] Norco is brand-name hydrocodone-acetaminophen. See Norco, WebMD, https://www.webmd.com/drugs/2/drug-63/norco-oral/details (last visited Jan. 24, 2019).

[11] Gabapentin can be used to relieve nerve pain. See Gabapentin, WebMD, https://www.webmd.com/drugs/2/drug-14208-8217/gabapentin-oral/gabapentin-oral/details (last visited Jan. 24, 2019).

[12] Baclofen treats muscle spasms. See Baclofen, WebMD, https://www.webmd.com/drugs/2/drug-8615/baclofen-oral/details (last visited Jan. 24, 2019).

[13] Anastrazole is a hormone inhibitor that treats breast cancer in women after menopause. See Arimidex, WebMD, https://www.webmd.com/drugs/2/drug-1555/anastrozole-oral/details (last visited Jan. 24, 2019).

[14] Prolia treats bone loss. See Prolia Syringe, WebMD, https://www.webmd.com/drugs/2/drug-154218/prolia-subcutaneous/details (last visited Jan. 24, 2019).

Plaintiff suffered from osteoporosis and other spinal issues (see J. Stip. at 8-9). Plaintiff argues that the ALJ should have "recontacted the treating doctors for further explanation or clarification or sent [her] out for a consultative examination." (Id.) She further contends that the ALJ improperly "cited to the objective findings of the MRI" because she was not a doctor and was not qualified to interpret them. (Id. at 9.)

The stage-agency physicians reviewed Plaintiff's medical records in March and June 2014 (see AR 476-85, 512-18), and so they did not see the December 2014 lumbar- and cervical-spine MRIs showing degenerative changes and cord flattening, among other issues (see AR 538-41). They also were not aware of Plaintiff's osteoporosis, which wasn't diagnosed until 2015. (See AR 536-37.) At most, they may have had access to records showing osteopenia. (See AR 536 (indicating clinical history of osteopenia based on 2010 records).) Thus, based on the information they had available at the time, the state-agency physicians discounted Plaintiff's bone pain.[15] (See, e.g., AR 483.) Because no state-agency doctor ever evaluated the MRIs or osteoporosis diagnosis, the record was inadequate and the ALJ had a duty to develop it further. See McLeod, 640 F.3d at 885 (holding that "inadequacy of the record to allow for proper evaluation triggers duty of inquiry").

---

[15] One of Plaintiff's treating doctors found that Plaintiff's "[c]ervical pain" could have been related to "severe osteoporosis from her medical treatments from breast cancer" (AR 560). That opinion postdated the reviewing doctors' opinions and thus they never saw it. (Id. (doctor's letter dated Apr. 27, 2016).)

15

When the record is inadequate, as here, an ALJ has discretion to order a consultative examination.[16] See Reed, 270 F.3d at 842; § 404.1519a. When "additional evidence needed is not contained in the records," a consultative examination is "normally require[d]." Reed, 270 F.3d at 842 (quoting § 404.1519a(b)(1)). Such an evaluation could have clarified the record in this case, but the ALJ did not order one. Instead, she evaluated the MRIs and bone-density evidence herself, determining that the MRIs showed only "slight abnormality that would have no more than a minimal effect on [Plaintiff's] ability to work" and that the osteoporosis was nonsevere. (AR 19.) Making these assessments without support from any physician was improper. See Padilla v. Astrue, 541 F. Supp. 2d 1102, 1106-07 (C.D. Cal. 2008); see also Zazueta v. Colvin, No. CV 14-1905 JC., 2014 WL 4854575, at *5 (C.D. Cal. Sept. 29, 2014) (collecting cases).

Thus, the ALJ did not fully and fairly develop the record, and remand is warranted on this ground.

---

[16] An ALJ could also discharge her duty to develop the record fully and fairly by "subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." Tonapetyan, 242 F.3d at 1150. Here, the ALJ left the record open for 24 days after the hearing so that Plaintiff could submit additional treatment evidence. (See AR 37, 574.) But apparently none of that evidence related to the MRIs or osteoporosis diagnosis. (Cf. AR 36 (ALJ agreeing to hold record open for treating notes from neurologist and pulmonologist).) Thus, leaving the record open was insufficient to meet the ALJ's duty to develop the record.

B.  <u>Remand for Further Proceedings Is Appropriate</u>

When an ALJ errs, as here, the Court "ordinarily must remand for further proceedings." <u>Leon v. Berryhill</u>, 880 F.3d 1041, 1045 (9th Cir. 2017) (as amended Jan. 25, 2018); <u>see also</u> <u>Harman v. Apfel</u>, 211 F.3d 1172, 1175-78 (9th Cir. 2000) (as amended). The Court has discretion to do so or to award benefits under the "credit as true" rule. <u>Leon</u>, 880 F.3d at 1045 (citation omitted). "[A] direct award of benefits was intended as a rare and prophylactic exception to the ordinary remand rule[.]" <u>Id.</u> The "decision of whether to remand for further proceedings turns upon the likely utility of such proceedings," <u>Harman</u>, 211 F.3d at 1179, and when an "ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency," <u>Leon</u>, 880 F.3d at 1045 (citing <u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775 F.3d 1090, 1105 (9th Cir. 2014)).

Here, further administrative proceedings would serve the useful purpose of allowing the ALJ to fully develop the record. <u>See</u> <u>Tonapetyan</u>, 242 F.3d at 1151. Because Plaintiff was not receiving specialized treatment for osteoporosis other than Prolia injections twice a year, two different physicians confirmed that follow-up bone-density testing was needed only once every two years (<u>see, e.g.</u>, AR 537, 563), and, as the ALJ noted, "treatment records document[ed] no treatment" for several of Plaintiff's alleged impairments (<u>see</u> AR 22), the Court has serious doubt whether she was disabled during any or all of the relevant period. For this reason, too, remand is appropriate. <u>See</u> <u>Garrison v. Colvin</u>, 759 F.3d 995, 1021 (9th Cir. 2014) (recognizing flexibility to remand for further proceedings when

17

"record as a whole creates serious doubt as to whether the [plaintiff] is, in fact, disabled").

Because the ALJ's assessment of Plaintiff's subjective pain statements was based on a record that was not fully developed, she should on remand reconsider those allegations. If the ALJ chooses to discount Plaintiff's subjective symptoms once again, she can then provide an adequate discussion of the reasons why. See Payan v. Colvin, 672 F. App'x 732, 733 (9th Cir. 2016). Accordingly, the court does not reach that issue. See Hiler v. Astrue, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand.").

**VI. CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[17] IT IS ORDERED that judgment be entered REVERSING the Commissioner's decision, GRANTING Plaintiff's request for remand, and REMANDING this action for further proceedings consistent with this memorandum decision.

DATED: January 24, 2019        JEAN ROSENBLUTH
                               U.S. MAGISTRATE JUDGE

---

[17] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."